UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| MOTIVA ENTERPRISES LLC, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:10-CV-793 (JCH) |
| | : | |
| v. | : | |
| | : | |
| W.F. SHUCK PETROLEUM ET AL., | : | FEBRUARY 15, 2012 |
| Defendants. | : | |
| | : | |

RULING RE:
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 36) and
PLAINTIFF'S MOTION TO STRIKE (Doc. No. 50)

I.      INTRODUCTION

Plaintiff, Motiva Enterprises LLC ("Motiva"), brings this action against defendants,

Warren F. Shuck, the president of Shuck Petroleum, and W.F. Shuck Petroleum

Company ("Shuck Petroleum"), which owns gas stations in Connecticut.  Motiva alleges

that Shuck Petroleum breached its contracts with Motiva, and that Warren F. Shuck is

personally liable for all of Shuck Petroleum's liabilities and debts to Motiva.  Defendants

counterclaim for breach of contract, breach of the covenant of good faith and fair

dealing, violation of the Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801-2841

("PMPA"), and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat.

§§ 42-100a-q ("CUTPA").  Each of the parties asserts multiple affirmative defenses.

Motiva's Complaint comprises six counts: Count One alleges that Shuck

Petroleum breached the 2009 WMA, a supply contract, by failing to pay for gasoline

sold and delivered in 2009; Count Two alleges that Shuck Petroleum breached the 2009

WMA by breaching the parties' "Incentive Agreements;" Count Three alleges that Shuck

Petroleum breached the 2009 WMA by failing to purchase the required base volumes of

gasoline in each of the years from 2009 through 2015; Count Four alleges that Shuck Petroleum breached the Incentive Agreements; Count Five alleges that Shuck Petroleum was unjustly enriched by its actions; and Count Six alleges that Warren Shuck breached a personal guaranty agreement by failing to pay the liabilities of Shuck Petroleum.  See Compl. (Doc. No. 1) ¶¶ 31-47.  Defendants' Answer asserts numerous affirmative defenses, as well as four counterclaims: Count One alleges that Motiva breached the 2009 WMA; Count Two alleges breach of the covenant of good faith and fair dealing; Count Three alleges that Motiva violated the PMPA by imposing unreasonable base volume requirements on Shuck Petroleum to coerce Shuck Petroleum to become a "subjobber" for another wholesaler; and Count Four alleges that Motiva violated CUTPA by engaging in acts or practices that constitute unfair competition, are immoral, unethical, or unscrupulous, and offend Connecticut public policy.  See Answer (Doc. No. 15) at 10-16.

Pending before the court are Motiva's Motion for Partial Summary Judgment (Doc. No. 36) ("Pl.'s Mot. for Summ. J.") and Motiva's Motion to Strike portions of Shuck's Affidavit (Doc. No. 50) ("Mot. to Strike").  The parties participated in a Telephonic Status Conference on December 15, 2011, at which time defendants represented to the court that the outstanding expert discovery was relevant to determinations of Motiva's damages in the form of lost profits, and did not preclude the court's consideration of Motiva's pending Motion for Summary Judgment.  See Minute Entry (Doc. No. 67).

## II.     FACTUAL BACKGROUND[1]

In 1998, Shuck Petroleum entered a Wholesale Marketer Agreement (WMA) with Star Enterprise, a joint venture of Texaco and Saudi Aramco.[2] See Wholesale Marketer Agreement, Ex. A to Defendants' Mem. of Law in Opp'n to Mot. for Partial Summ. J. (Doc. No. 46) ("1998 WMA").  The 1998 WMA, effective from July 1, 1998, until June 30, 2003, sets forth minimum quantities of Texaco brand motor fuel that Shuck Petroleum was obligated to purchase for each of the years covered by the agreement ("base volume requirements"), starting with 2,600,000 gallons in the twelve months from July 1, 1998, through June 30, 1999, and increasing by 200,000 gallons in each subsequent twelve month period.  See id.

Motiva alleges that on January 22, 1999, Warren F. Shuck signed a Personal Guaranty of Payment to act as a surety for Shuck Petroleum in its dealings with "Motiva Enterprises LLC, other affiliated companies, and any assignee or successor-in-interest." Personal Guaranty of Payment, Ex. 23 to Pl.'s L.R. 56(a)(1) Stmt. (Doc. No. 38-23) ("Guaranty").  In the Guaranty, Shuck "unconditionally and absolutely" agrees to pay Motiva for "any and all present and future indebtedness and liabilities owed to Motiva" by Shuck Petroleum.  Id.  The Guaranty purports to be "unlimited as to the amount and

---

[1] Unless otherwise cited, the following facts are based upon the uncontested portions of the parties' Local Rule 56(a) Statements, or are disputed facts asserted by defendants and as to which evidence has been placed in the record.

[2] Motiva does not explain its relationship to Star Enterprise in its submissions to the court.  At oral argument, Motiva's counsel represented the following corporate relationships:
Star Enterprise was a joint venture of Texaco and Saudi Aramco.  In 1998, Shell Oil entered into a joint venture with Texaco.  The western operations of the Shell-Texaco joint venture became a company called Equilon, and the eastern operations became Motiva.  As part of the joint venture between Shell Oil and Texaco, Motiva absorbed Star Enterprise.
In 2001, Texaco entered into a different joint venture with Chevron.  Equilon and Motiva's Texaco-branded locations and wholesale agreements began to be converted to the Shell brand.

time," and it appears to be notarized.  Id.  Shuck does not remember signing the Guaranty.  See Defs.' Second Corrected Local Rule 56(a)(2) Statement (Doc. No. 65) ("Defs.' L.R. 56(a)(2) Stmt.") ¶ 42; Amended Aff. of Warren F. Shuck (Doc. No. 60) ("Shuck Aff.") ¶ 7 ("I do not recall signing this document nor do I recognize the name of the notary public.").

In 2002, Shuck Petroleum and Motiva Enterprises entered into a Wholesale Marketer Agreement, effective September 1, 2002 to December 31, 2003.  See Wholesale Marketer Agreement, Ex. 2 to Pl.'s L.R. 56(a)(1) Stmt (Doc. No. 38-2) ("2002 WMA"); Pl.'s L.R. 56(a)(1) Stmt. ¶ 5; Def.'s L.R. 56(a)(2) Stmt. ¶ 5.  From January 1, 2003 through December 31, 2003, Shuck was required to purchase 3,400,000 gallons of petroleum.  See 2002 WMA at 2.  Motiva asserts that this agreement covers the period in which Texaco stations were rebranded as Shell stations.  See Pl.'s Mem. of Law in Support of Motiva's Motion for Partial Summary Judgment (Doc. No. 37) ("Pl.'s Mem. in Supp.") at 3-4.

The 2002 WMA does not specify the brand of the product to be sold, but includes several indications that Shell brand petroleum was the subject of the contract.  For example, the 2002 WMA prohibits Shuck Petroleum from using the word "Shell" in station names or signage in a way that would create the impression that Shell owned or operated the stations.  See 2002 WMA at 3.  Exhibit B, entitled "Buyer's Outlets," contemplates the conversion of retail locations from Texaco to Shell, see 2002 WMA at 17, and Exhibit C, entitled "Image Conversion Time Requirements," specifies a timeline for the conversion of outlets to the Shell brand.  See id. at 18.  The agreement is signed by "Equiva Services LLC [o]n behalf of Motiva Enterprises LLC."  See id. at 15.

4

In 2004, Motiva and Shuck Petroleum entered into a series of "Incentive Agreements," in which Shuck Petroleum agreed to remove and destroy its Texaco identifiers and convert its gas stations to the "Shell Retail Visual Identity level" specified in exchange for a cash grant from Motiva. Shuck Petroleum agreed that its gas stations would remain Shell-branded for the 120-month term of the agreements. The parties agree that Motiva's incentive payments to Shuck Petroleum pursuant to these agreements totaled $355,308.21.

The Incentive Agreements specify three events that constitute default by Shuck Petroleum: the debranding of a retail outlet, the termination of the Incentive Agreement, and the termination or non-renewal of the WMA. Upon default, the Agreements obligate Shuck Petroleum to repay a "recapture amount" equal to all or some of the incentive payments, depending on the length of the term remaining upon default. See Fast Fusion Incentive Agreements, Exs. 11-14 to Pl.'s L.R. 56(a)(1) Stmts. (Doc. Nos. 38-11, 38-12, 38-13, 38-14) ("Incentive Agreements") at ¶ 7. Both the Incentive Agreements and the 2009 WMA provide for interest at a rate of 15% per year or the maximum lawful rate, and for attorneys' fees to parties prevailing on claims. See Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 17, 26; Defs.' L.R. 56(a)(2) Stmt. ¶¶ 17, 26.

In late 2003, Shuck Petroleum and Motiva entered into a Wholesale Marketer Agreement, effective from January 1, 2004, until December 31, 2008. See Wholesale Marketer Agreement, Ex. 3 to Pl.'s L.R. 56(a)(1) Stmt ("2004 WMA"); Pl.'s L.R. 56(a)(1) Stmt. ¶ 5; Def.'s L.R. 56(a)(2) Stmt. ¶ 5. The 2004 WMA requires Shuck Petroleum to purchase 3,600,000 gallons of gasoline in 2004, with a 200,000 gallon increase in each subsequent year, ending with a 4,400,000 base volume requirement in 2008. See 2004

5

WMA at 2.  Like the 2002 WMA, the 2004 WMA does not specify that its subject is Shell-branded motor fuel, but contains the same prohibitions on the use of the Shell name, see id. at 3, and is signed by "Shell Oil Products US [o]n behalf of Motiva Enterprises LLC."  See id. at 15.

On November 16, 2004, Motiva sent Shuck Petroleum a letter entitled "Mutual Termination and Release – Notice of Termination for Abandonment."  See Ex. B to Aff. of Warren F. Shuck (Doc. No. 45) ("Notice of Termination").  The letter refers to "the Wholesale Marketer Agreement between W F Shuck Petroleum Company and Equilon Enterprises LLC, now doing business as Shell Oil Products US."[3]  Id.  The rest of the letter, in full, states as follows:

> According to Shell's records, Wholesaler has not purchased and sold TEXACO-branded motor fuels since **May 2004**.  The TEXACO franchise created by the Agreement appears to have been abandoned.
>
> Enclosed for your review and further handling is a Mutual Termination Agreement and Release to conclude formally the contractual and franchise relationship between Wholesaler and Shell.  The Mutual shall be effective **December 31, 2004** ("Effective Date"). Please execute and return this agreement to Shell on or before the Effective Date.  If Shell has not received a signed copy of the Mutual by the Effective Date, this letter is to advise you that Shell terminates the Agreement and the franchise relationship created thereby effective on the Effective Date, based upon Wholesaler's abandonment of the franchise.  Abandonment is a relevant event for which termination of the franchise is reasonable under Section 2802(b)(2)(C) of the Petroleum Marketing Practices Act, 15 U.S.C. § 2802(b)(2)(C) ("PMPA").
>
> The primary purpose of the TEXACO franchise granted to Wholesaler is to sell TEXACO-branded products at retail outlets throughout the term of the Contract.  Wholesaler's failure to purchase and to supply TEXACO motor

---

[3] As discussed above, Equilon was the western counterpart of Motiva; both were joint ventures of Shell and Texaco.  See supra n.1.  At oral argument, Motiva's counsel confirmed that Equilon, as the western operator, would not have been a party to the agreements with Shuck.  She suggested that the reference to Equilon could be a typographical error.

fuels to these outlets is unreasonable and violates this fundamental purpose of the franchise relationship. Termination on less than ninety days notice is therefore reasonable.

Enclosed is a Summary Statement of Title I of the PMPA ("Summary Statement") as prepared by the Department of Energy and published in the June 25, 1996 issue of the <u>Federal</u> <u>Register</u> (61 FR 32786-32790). Please do not hesitate to contact your Area Manager if you have any questions.

<u>Id.</u> (emphasis in original).  Shuck claims to have executed the Mutual Termination and Release contemplated by the Notice of Termination, but not to have retained a copy. <u>See</u> Shuck Aff. ¶ 11.  He also claims that defendants sought a copy in discovery, which Motiva has not produced.  <u>See</u> Defs.' L.R. 56(a)(2) Stmt. ¶ 42.  At oral argument, Motiva's counsel asserted that neither Motiva nor defendants had been able to locate a copy of the document.

Most recently, Motiva and Shuck Petroleum entered into a Wholesale Marketer Agreement effective from January 1, 2009, through December 31, 2015.  This agreement covers Shuck Petroleum's four retail locations in Connecticut, and expressly pertains to the Shell brand.  <u>See</u> Wholesale Marketer Agreement, Ex. 4 to Pl.'s L.R. 56(a)(1) Stmt. (Doc. No. 38-4) ("2009 WMA") at 1.  The 2009 WMA requires Shuck Petroleum to purchase at least 6,000,000 gallons of Shell-brand gasoline in 2009, and increases that amount by 250,000 gallons for each of the subsequent years.  The agreement was signed by "Shell Oil Products US [o]n behalf of Motiva Enterprises LLC" on July 29, 2008, and by Warren F. Shuck on behalf of Shuck Petroleum on July 26, 2008.  <u>See</u> 2009 WMA at 17.

On March 18, 2009, Shuck met with Steven Lancia, Motiva's area manager.  <u>See</u> Shuck Aff. ¶ 21.  Shuck and Lancia discussed the fact that Motiva would terminate the

franchise relationship with Shuck Petroleum if it failed to meet the base volume requirement for 2009.  Id.  Shuck asserts that he asked Lancia if there were "anything [they could] do," and that Lancia replied that there was nothing that he could do to help Shuck.  Id.  In one of the paragraphs of Shuck's Affidavit that Motiva has moved to strike, Shuck asserts that, in their March 2009 conversation, Lancia failed to disclose that Motiva was creating a program to allow Shell-branded stations to redeem Stop & Shop grocery store "reward points" and discounts.  See id. at 22; Mot. to Strike at 2.

> In a letter dated July 29, 2009, Motiva warned Shuck Petroleum:
>
> As of June 30, 2009, Buyer has purchased only 2,066,343 gallons of Shell-branded gasoline from Seller and, if the rate of purchases continues at such a level, Buyer is at risk of not meeting [its Base Volume Requirement under the 2009 WMA].  Buyer's failure to purchase the Base Volume is a breach of a reasonable provision of the Agreement that is of material significance to the franchise relationship and. as such, is grounds for termination under the Agreement and the Petroleum Marketing Practices Act, 15 U.S.C. § 2802(b)(2)(a).
>
> Accordingly, Seller requests that Buyer immediately take whatever actions are necessary to remedy this situation and to ensure that Buyer's contractual minimum Base Volume obligations are met in the future.  This letter is not a notice of termination, but is to inform Buyer of the possible consequences of Buyer's failure to do so.

Base Volume Warning Letter, Ex. D to Shuck Aff. (Doc. No. 45) (emphasis added).

On September 21, 2009, Shuck Petroleum executed contracts with Irving Oil, under which it was required to rebrand its four retail outlets.  See Shuck Aff. ¶ 24. Motiva claims that it was notified of Shuck Petroleum's intent to rebrand the retail outlets in late November 2009.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 29.  Defendants deny that late November was the first point at which Motiva knew that Shuck Petroleum was debranding, citing the Base Volume Warning Letter as "notification of intent to terminate," and Shuck's meeting with Lancia as further demonstration of Motiva's

intention to terminate the franchise arrangement.  See Defs.' L.R. 56(a)(2) Stmt. ¶ 29

(citing Shuck Aff. ¶¶ 21, 23). Shuck Petroleum stopped buying Shell gasoline and

rebranded its retail outlets in December 2009.  See Pl.'s L.R. 56(a)(1) Stmt. ¶ 30; Defs.'

L.R. 56(a)(2) Stmt. ¶ 30.

Motiva sent letters to Shuck Petroleum and Warren Shuck personally on

February 16, 2010, demanding payment for unpaid product and for the "recapture

amount" under the Incentive Agreements, totaling $684,567.67, plus lost profits.  See

Pl.'s L.R. 56(a)(1) Stmt. ¶ 37 (citing Letters, Exs. 17-18 to Pl.'s L.R. 56(a)(1) Stmt. (Doc.

Nos. 38-17, 38-18).  Defendants admit that Shuck Petroleum owes $341,296.84 for

gasoline delivered and sold, see Defs.' L.R. 56(a)(2) Stmt. ¶¶ 36, 37, but dispute Shuck

Petroleum's liability for amounts due pursuant to the Incentive Agreements and Warren

Shuck's personal liability for any amount.  See Defs.' L.R. 56(a)(2) Stmt. ¶¶ 39-42.

## III.   STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is

no genuine issue of material fact to be tried, and the facts as to which there is no such

issue warrant judgment for the moving party as a matter of law."  In re Dana Corp., 574

F.3d 129, 151 (2d Cir. 2009).  Thus, the role of a district court in considering such a

motion "is not to resolve disputed questions of fact but only to determine whether, as to

any material issue, a genuine factual dispute exists."  Id.  In making this determination,

the trial court must resolve all ambiguities and draw all inferences in favor of the party

against whom summary judgment is sought.  See Fed. R. Civ. P. 56(c); Loeffler v.

Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment."  United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009).  Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (stating that a non-moving party must point to more than a mere "'scintilla'" of evidence in order to defeat a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## IV.  DISCUSSION

Motiva moves for summary judgment as to liability on all five of its contract claims,[4] and it moves for summary judgment as to the amount of damages on three of those counts.

---

[4] Motiva does not move for summary judgment on Count Five, a claim for unjust enrichment.

A.     Breach of the 2009 WMA (Counts One, Three, and Four)

1.     Motiva's Claims[5]

a.     Applicable Law

The 2009 WMA provides that the "Agreement is subject to and governed by the Law of the State of Texas."  2009 WMA ¶ 32(h).  This court has jurisdiction to over Motiva's suit pursuant to 28 U.S.C. § 1332, and applies Connecticut choice of law rules, which give effect to parties' choice of law provisions so long as the choice has some reasonable basis and was made in good faith.  See ACSTAR Ins. Co. v. Clean Harbors, 783 F.Supp.2d 312, 318 (D. Conn. 2011); Elgar v. Elgar, 238 Conn. 839, 850-52 (1996).  Accordingly, the court looks to Texas law to evaluate Motiva's breach of contract claims.[6]

To prevail on these claims, Motiva must establish the existence of a valid contract, its own performance, a breach by defendants, and that it suffered damages as a result of the breach.  See  Pegram v. Honeywell, Inc., 361 F.3d 272, 288 (5th Cir. 2004).  The defendants do not appear to dispute the validity of the 2009 WMA.[7]

b.     Unpaid Gas Invoices (Count One)

Motiva moves for summary judgment as to Shuck Petroleum's breach of the 2009 WMA by its failure to pay debts incurred prior to the debranding in December

---

[5] Because defendants dispute Motiva's claims largely by arguing that a number of counterclaims and affirmative defenses excuse its breach rather than by disputing the facts supporting Motiva's claims, the court first addresses the evidence supporting Motiva's claims, and then addresses defendants' defenses.

[6] All parties agreed with this conclusion at oral argument.

[7] Defendants allege that the terms of the 2009 WMA were not negotiated between the parties, but rather offered by Motiva on a "take it or leave it basis," see Defs.' Mem. in Opp'n at 4, but do not argue that this fact somehow bears on the validity of the agreement.

11

2009.  See Pl.'s Mem. in Supp. at 11-12.  The parties agree that the 2009 WMA

requires Shuck Petroleum to purchase and resell a minimum of six million gallons of

Shell-branded gasoline in 2009, and to pay Motiva in a timely manner.  See Defs.' L.R.

56(a)(2) Stmt. ¶¶ 10-13; Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 10-13.  The parties also agree that

the 2009 WMA contemplates a number of grounds that entitle Motiva to terminate the

WMA, including Shuck Petroleum's failure to pay Motiva in a timely manner, and further

provides for interest at a rate of 15% per year or the maximum lawful rate, as well as

attorneys' fees on any overdue amounts.  See Defs.' L.R. 56(a)(2) Stmt. ¶¶ 16, 17; Pl.'s

L.R. 56(a)(1) Stmt. ¶¶ 16, 17.  Defendants admit that "Shuck Petroleum owes Motiva a

total of $341,296.84 for [gasoline deliveries and related charges incurred prior to

debranding]."  See Defs.' L.R. 56(a)(2) Stmt. ¶ 36; Pl.'s L.R. 56(a)(1) Stmt. ¶ 36.

Therefore, Motiva has supplied undisputed evidence to support its claim that Shuck

Petroleum failed to pay $341,296.84 it owed Motiva, in breach of the 2009 WMA.

> c.      Breach of the WMA by Breach of the Incentive Agreements
>          (Count Two)

Motiva seeks summary judgment on its claim that Shuck Petroleum's breach of

the Incentive Agreements constitutes a breach of the 2009 WMA.  See Pl.'s Mem. in

Supp. at 14-15.  The 2009 WMA provides:

> If Buyer terminates this Agreement prior to expiration of its term or if Seller
> terminates this agreement for cause in accordance with the PMPA or
> applicable Law, Seller will be entitled to all remedies however arising
> including, without limitation, all remedies available at law, in equity, or
> under contract including, without limitation, this Agreement or any
> incentive agreement pertaining to Buyer's Oulets.

2009 WMA at ¶ 2(g).  Defendants admit "that if Shuck Petroleum terminated the 2009

WMA prior to Motiva's breach of that agreement and/or violation of the Petroleum

Marketing Practices Act, then Motiva would be entitled to all remedies under the contract and incentive agreements." Defs.' L.R. 56(a)(2) Stmt. ¶ 15. By this admission, defendants concede that no disputed issues of material fact exist as to Motiva's claim in Count Two.

        d.     Failure to Purchase Base Volumes Required (Count Three)

Motiva seeks summary judgment as to Shuck Petroleum's liability for failure to purchase the amount of gasoline required in each of the years from 2009 through 2015. See Pl.'s Mem. in Supp. at 12-14. The parties do not dispute that the contract requires Shuck Petroleum to purchase from Motiva and resell the following amounts of Shell-branded gasoline: 6,000,000 gallons in 2009; 6,250,000 gallons in 2010; 6,500,000 gallons in 2011; 6,750,000 gallons in 2012; 7,000,000 gallons in 2013; 7,250,000 gallons in 2014; and 7,500,000 gallons in 2015. See Defs.' L.R. 56(a)(2) Stmt. ¶ 10; Pl.'s L.R. 56(a)(1) Stmt. ¶ 10; 2009 WMA ¶ 2(a). The 2009 WMA indicates that the base volume requirements were reasonable and of material significance to the contract. 2009 WMA ¶ 2(a); see also Pl.'s L.R. 56(a)(1) Stmt. ¶ 12; Defs.' L.R. 56(a)(2) Stmt. ¶ 12. Defendants admit that Shuck Petroleum "did not continue to purchase product from Motiva after December, 2009." Defs.' L.R. 56(a)(2) Stmt. ¶ 32. Defendants do not expressly admit, but do not appear to dispute, that Shuck Petroleum purchased less than 6,000,000 gallons of gasoline from Motiva in 2009. See, e.g., Shuck Aff. ¶ 19 ("Shuck Petroleum was in line to sell approximately 4,500,000 gallons of product during 2009"); id. ¶ 20 ("faced with a certain impossibility of performance under that agreement"). The parties do not dispute that Shuck Petroleum has not purchased any gasoline from Motiva since 2009. See Pl.'s L.R. 56(a)(1) Stmt. ¶ 30; Defs.' L.R. 56(a)(2)

Stmt. ¶ 30.  Therefore, the undisputed facts support Motiva's position that Shuck Petroleum did not meet the 2009 base volume requirement, and that this shortfall constitutes a breach of the 2009 WMA.

2.    Defenses to Enforcement

Although they admit facts sufficient to support summary judgment on breach of the 2009 WMA, defendants argue that Motiva's Motion should be denied because Motiva breached the 2009 WMA, violated the covenant of good faith and fair dealing, and violated the PMPA.  See Defs.' Mem. of Law in Opp'n to Mot. for Partial Summ. J. (Doc. No. 46) ("Defs.' Opp'n") at 10; see also id. at 12 ("By way of [its affirmative defenses and counterclaims], the Defendants have alleged, in effect, constructive termination of Shuck Petroleum's franchise relationship with Motiva in violation of the PMPA and bad faith conduct.").

In order for these arguments to defeat Motiva's Motion for Summary Judgment, defendants must adduce some evidence that, when viewed in the light most favorable to them, would allow a reasonable jury to find each element of a defense on which they would bear the burden of proof at trial.  See, e.g., FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994).

a.    Applicable Law

The choice of law provision in the 2009 WMA states that the agreement is "subject to and governed by the Law of the State of Texas." 2009 WMA ¶ 32(h).  Choice of law provisions with similarly narrow language have been construed by Connecticut courts to govern only claims and defenses that sound in contract.  "Connecticut courts have adopted the . . . [distinction] between provisions that govern controversies 'arising

14

out of or relating to' a contract, and those contracts that are 'governed by and construed in accordance with' the laws of a state.  The latter type of contract is deemed too narrow to apply to tort claims related to the contract."  <u>U.S. Fidelity and Guar. Co. v. S.B. Phillips Co.</u>, 359 F. Supp. 189, 205 (D. Conn. 2005) (internal citations omitted); <u>see also</u> <u>McKeown Distributors v. Gyp-Crete</u>, 618 F. Supp. 632, 643 n.5 (D. Conn. 1985) (noting that the parties' election to have the agreement "interpreted and governed by" Minnesota law does not preclude the plaintiff's CUTPA claim).  Defendants' counterclaim for breach of the 2009 WMA is clearly governed by Texas law based on the parties' choice of law provision.

Defendants' counterclaim for breach of the covenant of good faith and fair dealing sounds in tort, both in Connecticut and in Texas.[8]  Because the narrow choice of law provision does not extend to tort claims, the court must apply Connecticut choice of law rules, which prescribe the application of the law of the state with the most significant relationship to the occurrence and the parties.  <u>See</u> <u>Otis Elevator v. Factory Mut. Ins.</u>, 353 F. Supp. 2d 274, 285 (D. Conn. 2005).  The factors considered to determine the most significant relationship include the place of the injury, the place of the conduct that caused the injury, the places of the parties, and the place that the relationship between the parties is centered.  <u>See</u> Rest. (2d) Choice of Law § 145.

---

[8] Although a Connecticut action for breach of the covenant of good faith and fair dealing is based on the existence of a contract, courts have held that the action sounds in tort.  <u>See, e.g.</u>, <u>Cent. Sports v. Yamaha Motor</u>, 477 F. Supp. 2d 503, 511 (D. Conn. 2007) ("Under Connecticut law, every contract contains an implied covenant of good faith and fair dealing, violation of which is actionable in tort."); <u>Citizens Commc'ns Co. v. Trustmark Ins.</u>, 303 F. Supp. 2d 197, 207-08 (D. Conn. 2004) ("Connecticut courts have explicitly stated that the breach of the covenant of good faith and fair dealing creates a distinct tort cause of action.").  Similarly, under Texas law, "a claim for breach of duty of good faith and fair dealing is a tort action that arises from an underlying contract."  <u>Cole v. Hall</u>, 864 S.W.2d 563, 568 (Tex. App. 1993).

"These contacts are to be evaluated according to their relative importance with respect to the particular issue." <u>Otis Elevator</u>, 353 F. Supp. 2d at 285.

The place of the alleged injury is Connecticut, where both defendants are located.  Connecticut is also the place of the meeting between Shuck and Lancia, which could be considered the conduct alleged to have caused the injury.  Although Motiva has its principal place of business in Texas, the other relevant factors counsel in favor of applying the law of Connecticut to defendants' claim of breach of covenant of good faith and fair dealing.[9]

Defendants third counterclaim, for violation of the PMPA, is a federal cause of action and is therefore analyzed under federal law.

> b.      Breach of Contract

Defendants argue that the court should deny summary judgment based on its fourth affirmative defense and its first counterclaim, both of which allege that Motiva breached the 2009 WMA.  <u>See</u> Defs.' Opp'n at 9-10.  Defendants do not cite a particular provision of the contract with which Motiva has failed to comply.  Instead, they imply that Motiva repudiated the contract by some combination of its Base Volume Warning Letter

---

[9] The claim would also fail if the court applied Texas law.  In Texas, "[a] duty of good faith is not imposed in every contract but only in special relationships marked by shared trust or an imbalance in bargaining power."  <u>FDIC v. Coleman</u>, 795 S.W.2d 706, 708-09 (Tex. 1990) (noting types of relationships that do not ordinarily involve a duty of good faith, including mortgagor and mortgagee, creditor and guarantor, and lender and borrower).  The Texas Supreme Court has explicitly declined to extend the duty of good faith and fair dealing to all franchise relationships.  <u>See</u> <u>Subaru of America v. David McDavid Nissan</u>, 84 S.W.3d 212, 225 (Tex. 2002).  Texas courts have found that a special relationship exists when the party asserting it presents facts to support a finding of unequal bargaining power and the likelihood of abuse by the more powerful party.  <u>See, e.g.</u>, <u>Barrand v. Whataburger</u>, 214 S.W.3d 122, 138-39 (Tex. App. 2006) (citing cases).  In this case, defendants have not argued that Shuck Petroleum has such a special relationship with Motiva, nor have they alleged any facts or presented any evidence supporting such an argument.

and the March 2009[10] meeting between Warren Shuck and Steven Lancia.[11]  See Defs.'

Opp'n at 5-6.  At oral argument, defendants contended that the meeting and the letter

caused Warren Shuck to reasonably believe that Motiva had terminated the 2009 WMA.

In Texas, the elements of anticipatory breach are: "(1) an absolute repudiation of

the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-

repudiating party."  Gonzalez v. Denning, 394 F.3d 388, 394 (5th Cir. 2004).  To

constitute a repudiation of the obligation, the repudiating party must indicate in positive,

unconditional terms a refusal to perform its contractual duties.  See Preston v. Love,

240 S.W. 2d 486, 487 (Tex. Civ. App. 1951).

The Base Volume Warning Letter advises Shuck Petroleum that it had purchased

only 2,066,343 gallons of petroleum as of June 30, 2009, and that if it did not increase

its rate of purchase, it was at risk of not meeting the 2009 base volume requirement,

which would constitute a breach of the 2009 WMA.  See Base Volume Warning Letter.

The letter therefore "requests that Buyer immediately take whatever actions are

necessary to remedy this situation . . . . This letter is not a notice of termination, but is to

inform Buyer of the possible consequences of Buyer's failure to do so."  Id. (emphasis

added).

According to defendants' description, Lancia told Shuck in March 2009, that if

Shuck Petroleum did not meet its base volume requirement, Motiva would debrand

Shuck Petroleum and terminate its franchise at the end of the year.  See Shuck Aff.

_____

[10] Defendants' Memorandum in Opposition alleges that the meeting took place in August 2009,
see Defs.' Opp'n at 6, but later-filed, amended documents, including Shuck's Amended Affidavit
and defendants' Second Corrected Local Rule 56(a)(2) Statement, allege that the meeting took place on
March 18, 2009.  See Shuck Aff. ¶ 21; Defs.' L.R. 56(a)(2) Stmt. ¶ 28.

[11]

¶ 21.  Based on this, Shuck "believed that Shuck Petroleum would be debranded at the end of 2009 for failure to meet the . . . Base Volume requirement under the 2009 WMA." Id.  Shuck alleges that he then entered the contract with Irving "[i]n reliance on the notification of intent to terminate, and in light of Lancia's statements."  Shuck Aff. ¶ 23.

Neither the letter nor defendants' description of Lancia's statements constitutes evidence of an unconditional repudiation by Motiva.  The letter is expressly conditioned on Shuck Petroleum continuing to fail in its obligation to meet its base volume requirements, and Lancia's statements were responsive to Shuck's question about the results of Shuck Petroleum's failure to meet its base volume requirements.  Moreover, in each instance, the stated condition upon which termination would occur is a condition upon which the 2009 WMA permits termination.  The parties agreed in writing that Shuck Petroleum's failure to meet its base volume requirements would constitute a breach of the contract by Shuck Petroleum.  Thus, in addition to their lack of "absolute repudiation," Gonzalez, 394 F.3d at 394, these statements do not indicate repudiation of the contract's terms.  Therefore, under Texas law, neither the Base Volume Requirement Letter nor Lancia's statements suffice to permit a reasonable jury to find that Motiva breached or repudiated the 2009 WMA.

c.      Breach of the Covenant of Good Faith and Fair Dealing

In Connecticut, "the implied duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . [E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Hoskins v. Titan Value Equities Grp., 252 Conn. 789, 793 (2000) (citation omitted).  An action for breach of the covenant of good faith and fair dealing requires a showing that,

18

"(1) a plaintiff and defendants were parties to a contract under which the plaintiff expected to receive certain benefits; (2) the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and (3) that the defendant was acting in bad faith."  See Pateley Assocs. I v. Pitney Bowes, Inc., 704 F. Supp. 2d 140, 158 n.16 (D. Conn. 2010).  In other words, the defendant's actions must have been taken in bad faith, and must have impeded the plaintiff in receiving reasonably expected benefits under the contract.  See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004).  An important element of any such claim is that of conscious wrongdoing by the person or entity against whom the claim is lodged.  See, e.g., Buckman v. People Exp., 205 Conn. 166, 170-171 (1987); see also Miller Auto Corp. v. Jaguar Land Rover N.A., No. 3:09-CV-1291(EBB), 2011 WL 4430842 at *3 (D. Conn. Sept. 16, 2011).

In portions of his Affidavit that Motiva moves to strike, Shuck asserts that Motiva wanted Shuck Petroleum to give up its franchise because this would increase profits for Motiva, and he implies that Lancia did not disclose the partnership with Stop & Shop that Motiva was developing for the same reason.  See Defs. L.R. 56(a)(2) Stmt. ¶¶ 16, 22.  The court need not decide the Motion to Strike because, even taking Shuck's assertions as true, they do not provide the basis for a jury to find a breach of the covenant of good faith and fair dealing.  Shuck's allegations—that Motiva and Lancia were pursuing profits—do not attribute any conscious wrongdoing to Motiva, nor do they indicate that Motiva interfered with any of defendants' rights under the 2009 WMA. Therefore, they do not create a genuine issue of material fact as to whether Motiva

breached the covenant of good faith and fair dealing, and are insufficient to avoid summary judgment.

> d.    Violation of the PMPA

Defendants' tenth affirmative defense and third counterclaim allege that Motiva violated the PMPA.  See Defs.' Opp'n at 9-10.  It appears that these allegations are based on allegations that Motiva violated the PMPA's notification provisions and on allegations that Motiva constructively terminated the 2009 WMA.  See Defs.' Opp'n at 11 (discussing PMPA notice provisions); id. at 12 (discussing constructive termination).

> i.    Whether the defendants have presented evidence to support a claim that Motiva constructively terminated its franchise relationship with Shuck Petroleum.

Defendants cite Mac's Shell Serv. v. Shell Oil, 130 S. Ct. 1251 (2010) for the proposition that "[a] service station franchisee may recover for constructive termination under the PMPA when the franchisors alleged wrongful conduct forces the franchisee to abandon its franchise."  Defs.' Opp'n at 12.  In that case, the Supreme Court held that a franchisee seeking recovery for constructive termination under the PMPA must demonstrate that the franchisor's conduct forced the franchisee to abandon its franchise.  See Mac's Shell, 130 S. Ct. at 1257.  Because the franchisees in Mac's Shell had not abandoned their franchises, the Supreme Court explicitly declined to decide whether the PMPA creates a cause of action for constructive termination.  See id. at 1257 n.4.  The Second Circuit has likewise not yet decided whether to recognize claims of constructive termination of a franchise relationship under the PMPA.  See, e.g., Atlantic Autocare, Inc. v. Shell Oil Products, 605 F. Supp. 2d 463, 467 n.1, 468-69 (S.D.N.Y. 2009).  Moreover, most courts have not recognized constructive termination

claims under the PMPA outside the context of assignments of franchise agreements by franchisors.  See id. at 468-69; see also Abrams Shell v. Shell Oil, 343 F.3d 482, 487-88 (5th Cir. 2003).

Courts considering claims of constructive termination of a franchise have required plaintiffs to show that defendants breached one or more of the three "core components" of a franchise: "a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold."  Abrams Shell, 343 F.3d at 487-88; see also Mac's Shell, 130 S.Ct. at 1256; Yonaty v. Amerada Hess Corp., No. 3:04-CV-605 (FJS/DEP), 2009 WL 2824733 at *5 (N.D.N.Y. 2009).

Defendants have not adduced any evidence upon which a reasonable jury could find that Motiva breached its contract to supply motor fuel or forced Shuck Petroleum to abandon the franchise. Therefore, defendants' unsupported argument that Motiva constructively terminated the franchise agreement is insufficient to avoid summary judgment.

ii.    Whether Motiva breached the PMPA by failing to comply with its notice requirements.  Defendants include a substantial description of the notice required to terminate a franchise agreement governed by the PMPA.  See Defs.' Opp'n at 10-11 (discussing 15 U.S.C. §§ 2802, 2804).  However, defendants have not presented any evidence by which a reasonable jury could find that Motiva did, in fact, terminate its franchise agreement with Shuck Petroleum prior to Shuck Petroleum's debranding, nor have they explained how the PMPA notice provisions apply to this case.  Therefore,

defendants cannot avoid summary judgment based on the notice provisions of the PMPA.

B. <u>Breach of the Incentive Agreements (Count Two)</u>

Motiva seeks summary judgment on its claim that Shuck Petroleum breached the Incentive Agreements, entitling Motiva to the "recapture amounts" in those agreements. <u>See</u> Pl.'s Mem. in Supp. at 14.

1. Applicable Law

The Incentive Agreements do not contain provisions specifying the parties' choice of law.  This court has jurisdiction over Motiva's suit pursuant to 28 U.S.C. § 1332, and applies Connecticut choice of law rules.  <u>See</u> <u>ACSTAR Ins. Co. v. Clean Harbors</u>, 783 F.Supp.2d 312, 318 (D. Conn. 2011).  "Where there is no choice of law provision in the contract, the general rule to be applied is that of § 188 [of the Restatement (Second) of Conflict of Laws]."  <u>American States Ins. Co. v. Allstate Ins. Co.</u>, 282 Conn. 454, 461 (2007).  Section 188 provides in relevant part, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6."  <u>See</u> <u>id.</u> n.6.  Section 6 sets forth seven "overarching considerations in determining which state has the most significant relationship" to the dispute:

> (a) the needs of interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

22

<u>Allstate</u>, 282 Conn. at 467-68.  Section 188(2) lists five contacts to be considered in applying the principles set forth in section 6 to a contract dispute: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."  <u>Id.</u> at 468.

The parties have not created a record that allows this court to fully analyze each of these factors.[12]  The court has no information as to the place of contracting or the place of negotiation of the Incentive Agreements.  Therefore, the court cannot consider these factors.  The parties to the contracts are Motiva, a limited liability company organized under the laws of Delaware, with its principal place of business in Houston, Texas, and Shuck Petroleum, a Connecticut Company.  <u>See</u> Compl ¶¶ 1, 2; Answer ¶ 2.  The subject matter of the contracts is the sale of gasoline and the branding and marketing of four gas stations in Connecticut, which indicates that Connecticut is the place of performance of the contracts.  Therefore, the court applies Connecticut law to the Incentive Agreements.

The elements of breach of contract in Connecticut are "the formation of an agreement, performance by one party, breach of the agreement by the other party[,] and damages."  <u>FCM Group v. Miller</u>, 300 Conn. 774, 798 (2011) (internal citations omitted).

---

[12] In its Motion, Motiva asserts that this analysis "likely favor[s] the application of Connecticut law," and recites the relevant factors, but does not provide any information as to their application to this case.  Pl.'s Mem. in Supp. at 14.  Defendants do not make any argument as to the law applicable to the Incentive Agreements.  At oral argument, the parties agreed that Connecticut law applies.

2.      Evidence of Breach

The parties do not appear to dispute the validity of the Incentive Agreements.

See Pl.'s L.R. 56(a)(1) Stmt. ¶ 18; Defs.' L.R. 56(a)(2) Stmt. ¶ 18.  Shuck Petroleum

admits that the Incentive Agreements require that its gas stations sell Shell gas and

display Shell brand "Retail Visual Identity" for the 120-month term of the Incentive

Agreements.  See Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 22, 24; Defs.' L.R. 56(a)(2) Stmt. ¶¶ 22,

24.  Shuck Petroleum further admits that it debranded in December 2009, and that the

aggregate "recapture amount" pursuant to the Incentive Agreements is $343,270.83.

See Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 30, 40; Defs.' L.R. 56(a)(2) Stmt. ¶¶ 30, 40.  Based on

these undisputed facts, a reasonable jury could find that Shuck Petroleum breached the

Incentive Agreements.  The defendants have failed to raise a material issue of fact in

this regard.

3.      Defenses to Enforcement

Defendants oppose summary judgment on breach of the Incentive Agreements

on the same grounds discussed in relation to the breach of the 2009 WMA above:

Motiva's breach of contract, violation of the PMPA, and breach of the covenant of good

faith and fair dealing.  See Defs.' Mem. in Opp'n at 10-12.  Defendants' claim that

Motiva violated the PMPA is unsupported under federal law, as discussed above.

Defendants' breach of contract and breach of the covenant of good faith and fair dealing

claims are governed by Connecticut law when considered as defenses against

enforcement of the Incentive Agreements, and are therefore discussed below.

24

a.      Breach of Contract

Defendants have not specified the actions by which they allege Motiva breached the Incentive Agreements.  See generally Defs.' Opp'n at 10-13. Therefore, the court cannot identify any evidence in the record that could create a material issue of fact with regard to defendants' claim that Motiva breached the agreements.

b.      Breach of the Covenant of Good Faith and Fair Dealing

For the reasons discussed above in relation to Motiva's claim of breach of the 2009 WMA, the court finds that defendants have not adduced evidence that would permit a reasonable jury to find that Motiva breached the covenant of good faith and fair dealing.  See supra at 18-19.

C.      Warren F. Shuck's Personal Guaranty

Motiva moves for summary judgment on its claim that that Warren Shuck is individually liable for the damages sought in Counts One through Four.  See Pl.'s Mem. in Supp. at 15-16.  Motiva submits a document entitled "Personal Guaranty of Payment," by which Warren Shuck "unconditionally and absolutely agrees to make payment directly to Motiva when due of any and all present and future indebtedness and liabilities owed to Motiva by [W.F. Shuck Petroleum]."  Guaranty at 1.  The Guaranty states that it is "unlimited as to the amount and time," and that it may not be "terminated, amended, supplemented, waived or modified, except by an instrument in writing signed by the party against which the enforcement of this termination, amendment, or supplement, waiver, or modification shall be sought."  Id. at 1, 2. It is dated January 22, 1999, and appears to be signed by Shuck and notarized.  Id. at 2.

25

1.      Applicable Law

The Guaranty does not specify the applicable law.  As with the Incentive

Agreements above, this court applies Connecticut choice of law rules and chooses the

law of the state with the most significant relationship to the contract.  See ACSTAR Ins.

Co. v. Clean Harbors, 783 F.Supp.2d 312, 318 (D. Conn. 2011); American States Ins.

Co. v. Allstate Ins. Co., 282 Conn. 454, 461 (2007).  As with the Incentive Agreements,

the court lacks sufficient information to analyze all of the factors under the

Restatement.[13]  The court has no information as to the place of contracting or the place

of negotiation of the contract, and the Guaranty does not specify a place of

performance.  Therefore, the court cannot consider these factors.  The parties to the

contract are Motiva, a limited liability company organized under the laws of Delaware,

with its principal place of business in Houston, Texas, and Warren Shuck, an individual

residing in Connecticut.  See Compl ¶¶ 1, 3; Answer ¶ 3. The subject matter of the

contract is Warren Shuck's promise to pay the debts and liabilities of Shuck Petroleum,

a Connecticut company, to Motiva.  The debts and liabilities of Shuck Petroleum are

incurred in the operation of its business in Connecticut.  Therefore, the court applies

Connecticut law to the Guaranty.

Connecticut courts "look to the standard principles of contract interpretation to

determine the rights and obligations" pursuant to surety contracts.  U.S. Fidelity and

Guar. Co. v. Braspetro Oil Servs., 369 F.3d 34, 51 (2d Cir. 2004); see also Elm Haven

Const. v. Neri Const., 281 F. Supp. 2d 406, 408, 412 (D. Conn. 2003).

---

[13] In their Opposition, defendants assert that the Guaranty "must be analyzed using the principles of the Restatement of Contracts as adopted by Connecticut's Supreme Court."  Defs.' Opp'n at 14. Motiva does not make any argument as to the law applicable to the Guaranty.

2.      Shuck's Personal Obligation Pursuant to the Guaranty

Motiva argues that that it is entitled to summary judgment on Shuck's liability

pursuant to the Guaranty because the Guaranty is an ongoing obligation that has never

been altered or amended, and Shuck has never paid the amounts due.  See Pl.'s Mem.

in Supp. at 9, 15.  Defendants oppose summary judgment on Shuck's liability, first by

disputing that Shuck signed the Guaranty and then by arguing that, even had he signed

it, it is no longer in force.[14]  See Defs.' Mem. in Opp'n at 14-16.

a.      Whether Shuck Signed the Guaranty

Defendants assert that "Shuck does not believe he signed a personal guaranty,"

and Shuck's Affidavit reiterates this assertion, stating, "Motiva has produced a purported

document styled 'Personal Guaranty of Payment,' dated 1999, relating to Shuck

Petroleum's then-existing marketing relationship with Star.  I do not recall signing this

document nor do I recognize the name of the notary public."  Defs.' Opp'n at 14; Shuck

---

[14] At oral argument, defendants opposed summary judgment on the Guaranty on the additional
ground that there exists a question of material fact as to whether it was supported by consideration.  The
Guaranty begins: "For value received, and to induce Motiva . . . to undertake or continue to sell goods
and/or lease property or enter into other transactions with W.F. Shuck Petroleum . . . ."  Guaranty at 1.
The Guaranty was signed in January 1999, months after the 1998 WMA, at which point Motiva's
relationship with Shuck Petroleum was governed in part by the PMPA.

In Connecticut, "the recital of consideration acknowledged as received is prima facie evidence of
the fact recited."  Taft Realty Corp. v. Yorkhaven Enters., 146 Conn. 338, 342 (1959).  When a party signs
a continuing guarantee that recites consideration, it is enforceable for transactions within its
contemplation even if the guarantee was signed significantly after the underlying contract was signed, so
long as further advances are made after the execution of the guarantee.  See General Elec. Capital Corp.
v. Transp. Logistics Corp., 94 Conn. App. 541, 544-47 (2006) (rejecting the argument that no
consideration was given for a guarantee signed over twenty months after the underlying lease agreement
where the guarantee recited that consideration had been given but did not specify its form, and further
credit was extended after the guarantee was signed).

Motiva has adduced undisputed evidence that the Guaranty recites consideration and that further
credit was extended subsequent to the execution of the Guaranty in 1999.  Defendants have not come
forward with any evidence by which a jury could find that credit was not extended subsequent to the
Guaranty, or to rebut the presumption that the consideration mentioned in the Guaranty is legally
sufficient.  Thus, defendants have not raised a genuine issue of material fact as to whether the Guaranty
is supported by consideration.

Aff. ¶ 7.  In their statement of facts, defendants deny all of Motiva's assertions relating to the Guaranty on this ground.  See Defs.' L.R. 56(a)(2) Stmt. ¶¶ 42-47.

"[A] notary public's certificate of acknowledgement, regular on its face, carries a strong presumption of validity."  See Lombardo v. United Tech., No. 3:95CV02353 (WWE), 1997 WL 289669 at *2 (D. Conn. May 9, 1997).  Courts have not allowed parties to avoid summary judgment on the basis of their claims not to remember signing a document or not to recognize the signature on a document.  See, e.g., Media Group v. Tuppatsch, 298 F. Supp. 2d 235, 248-49 (D. Conn. 2003) (concluding that plaintiff's claim not to recognize his signature on a notarized document was insufficient to avoid summary judgment, where defendant submitted evidence attesting to the validity of the signature); see also Vardanyan v. Close-Up Intern, 315 Fed. Appx. 315, 317-18 (2d Cir. 2009) (finding no issue of material fact as to the validity of a signature on a document in the record where the purported signatory claimed not to remember signing the document, but there was no admissible evidence that the document was fabricated).

Shuck does not assert that he did not sign the document, nor have defendants adduced any evidence to support such an argument.  They have not, for example, alleged that the signature is forged or presented any evidence regarding the notary. Shuck's assertion that he does not remember signing the document is not, in itself, sufficient to create a material issue of fact to defeat Motiva's Motion for Summary Judgment.

           b.      The Limitation of the Guaranty to a 'Reasonable Time'

Defendants next argue that summary judgment should not be granted on the Guaranty because Connecticut law limits the operation of the Guaranty to a period of

time that is reasonable in light of the circumstances.  See Defs.' Mem. in Opp'n at 14-

15.  The Connecticut Supreme Court has explained the legal bases for terminating a

guaranty contract:

> A guaranty contract is continuing if it contemplates a future course of dealing during an indefinite period or it is intended to cover a series of transactions or a succession of credits, or if its purpose is to give to the principal debtor a standing credit to be used by him from time to time. An offer for a continuing guaranty is ordinarily effective until revoked by the guarantor or extinguished by some rule of law. . . . To revoke a continuing guaranty, the guarantor usually must give notice of the revocation to the creditor . . . However, even a continuing guaranty that is, in terms, unlimited as to duration, imposes liability upon a guarantor only for such period of time as is reasonable in light of all the circumstances of the particular case. . . . The interpretation of a continuing guaranty, as well as the question of its revocation, ordinarily is a question of fact.

Associated Catalog Merchandiser v. Chagnon, 210 Conn. 734, 742 (1989) (internal

citations omitted).  In Monroe Ready Mix Concrete v. Westcor Dev., 183 Conn. 348

(1981), the Connecticut Supreme Court upheld a finding that the parties intended to

cancel and nullify a continuing guaranty based on a "discontinuance of business

between the parties after the account had been paid in full, for a period of thirty-one

months," as well as the guarantor's refusal to sign a subsequent guaranty.  Id. at 350.

Where there is no evidence of the parties' intent to abandon or terminate a guaranty

agreement, courts have rejected claims of lapse.  See, e.g., Sprague Energy Corp. v.

Levco Tech, No. 3:09CV29(RNC), 2009 WL 1374593 at *13-14 (D. Conn. May 11,

2009); Resolution Trust Corp. v. Williams Assocs. IV, No. 2:92CV312 (AHN), 1994 WL

511590 at *4 (D. Conn. Sept. 8, 1994); L. Suzio Concrete v. Birmingham Const. Servs.,

79 Conn. App. 211, 215-16 (2003) ("this is not a case like Monroe Ready Mix); Astro Oil

v. Gherlone, No. CV000438857, 2001 WL 1004254 at *1 (Conn. Super. Aug. 3, 2001).

The Guaranty in this case "is unlimited as to the amount and time" and provides that Shuck may revoke by written notice.  See Guaranty at 1.  Defendants have not argued that Shuck Petroleum revoked the Guaranty by giving written notice.  Shuck Petroleum and Motiva remained in a continuing business relationship from 1999 until the events in December 2009 that gave rise to Motiva's claims.  Defendants have not introduced any evidence of any period of inactivity in relation to the underlying relationship between Motiva Enterprises and Shuck Petroleum.  Therefore, there exists no genuine issue of material fact as to the lapse or formal revocation of the Guaranty.

c.      Mutual Termination of the Guaranty

Finally, defendants argue that the Guaranty was terminated by the 2004 Mutual Termination and Release regarding Shuck Petroleum's sale of Texaco brand gas.  The Mutual Termination and Release is not in the record before the court, but the Notice thereof indicates that the Release terminates the agreement between Shuck Petroleum and Shell Oil for the sale of Texaco-brand fuel, effective December 31, 2004.  See Notice of Termination.  The Notice is dated November 16, 2004, at which point Shuck Petroleum had already entered into the 2004 WMA, which governed the relationship from 2004 until 2008.  See id.; 2004 WMA.  To the extent that defendants seem to argue that the business relationship between Motiva and Shuck Petroleum was terminated by the Mutual Termination and Release, this argument is flatly contradicted by the evidence of five subsequent years of business dealings between the two parties.  To the extent that defendants seem to argue that there was a lapse in the business relationship between Motiva and Shuck Petroleum, they have not put forth any evidence on which a jury could find in their favor on this argument.  To the extent that defendants

seem to argue that the Guaranty pertains only to debts incurred pursuant to the 1998 WMA, this argument is flatly contradicted by the terms of the Guaranty.  See Guaranty at 1 (agreeing to pay "any and all present and future indebtedness and liabilities owed to Motiva by [Shuck Petroleum]").

In the absence of evidence to support Shuck's defenses to enforcement of the Guaranty, it is enforceable against Shuck.  By its terms, he is personally liable for Shuck Petroleum's obligations to Motiva.  Defendants have not created a material issue of fact to defeat summary judgment on the Guaranty.

D.    Damages

Motiva moves for partial summary judgment as to the amount of its damages under Counts One, Two, and Four.  See Pl.'s Mem. in Supp. at 12, 14-15.  On Count One, it claims $341,296.84 for unpaid invoices, but does not move for summary judgment as to the amount of attorneys' fees, costs, and expenses.  Id. at 12.  On Counts Two and Four, it claims $343,270.83 for the recapture amounts in the Incentive Agreements, but does not move for summary judgment as to the amount of attorney's fees, costs, and expenses.  Id. at 15.

Defendants do not dispute these amounts.  See Defs.' L.R. 56(a)(2) Stmt. ¶¶ 30, 36, 37, 40.  Because defendants have not disputed these amounts, there are no issues of material fact precluding partial summary judgment on Motiva's damages under Counts One, Two, and Four.

E.    Defendants' Counterclaims

Defendants bring counterclaims against Motiva for breach of the 2009 WMA, breach of the covenant of good faith and fair dealing, violation of the PMPA, and

31

violation of CUTPA.  See Answer at 10-16.  Because defendants relied on all but the CUTPA counterclaim in their Opposition to Motiva's Motion for Summary Judgment, they were obligated to come forward with some evidence that would permit a jury to rest a finding in their favor on those counterclaims.  See supra at 14 (citing FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994)).  Where a party was on notice that it was required to come forward with all of its evidence and a court finds no material issue of fact, the court may grant summary judgment against that party.  See Pugh v. Goord, 345 F.3d 121, 124 (2d Cir. 2003); Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996) ("[if] all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a sua sponte grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists").

The court has reviewed and considered all of the evidence cited by defendants to support their claims that Motiva breached the 2009 WMA, breached the covenant of good faith and fair dealing, and violated the PMPA, and has found that the evidence adduced by the defendants presents no material issues of fact on which a reasonable jury could find for the defendants on these three claims.  See supra at 16-21, 24-25. Therefore, the court grants summary judgment against defendants on these three counterclaims.

      E.     Motiva's Motion to Strike (Doc. No. 50)

Motiva has also moved to strike portions of Shuck's Affidavit.  See Mot. to Strike. Because the court need not discredit the contested portions of Shuck's Affidavit to rule

in favor of Motiva's Motion for Summary Judgment, the Motion to Strike is **DENIED WITHOUT PREJUDICE**.

## V.  CONCLUSION

For the foregoing reasons, the court **GRANTS** Motiva's Motion for Partial Summary Judgment (Doc. No. 36) as to liability and partial damages on Counts One, Two, and Four, and as to liability on Counts Three and Six of Motiva's Complaint.  The court **DENIES** Motiva's Motion to Strike (Doc. No. 50).  The court **GRANTS** summary judgment against defendants and in favor of Motiva on the first, second, and third of the defendants' counterclaims.

Remaining to be determined are: the amount of attorney's fees, costs, and expenses pursuant to Motiva's first, second, and fourth counts; damages pursuant to Motiva's third and sixth counts; liability as to Motiva's fifth count for unjust enrichment; and liability as to defendants' fourth count for violation of CUTPA.  The parties are ordered to confer and file, no later than February 29, 2012, a proposed schedule and process for the complete resolution of this case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 15th day of Febraury, 2012.


_____/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge